Good morning. My name is Eric Graffi, and I'm here on behalf of Center for Biological Diversity appellants. I'd like to reserve three minutes for rebuttal. This case challenges the Willow development project in Alaska's western Arctic. In reviewing and approving the project, and arbitrarily, in several significant ways. First, BLM prepared an environmental impact statement that refused to evaluate the effects of any alternative that stranded economically viable oil on ConocoPhillips' leases. It did so because it concluded that it lacked the authority to approve anything but a full field project. But then, in the record of decision, it abandoned this principle, and it did approve a project that stranded oil on Conoco's leases. This reversal demonstrates that the constriction in the EIS was unnecessary, and thus arbitrary. Yet, it's the principle by which the BLM refused to consider, screened out, reasonable alternatives that would have had less impact that were proposed by the plaintiffs and others. Can I ask, Mr. Graffi? I've been wrestling with trying to understand the difference between the right to extract all the oil and gas possible within a leased area, which was the basis for the district court reversing the approval the first time, and the full development criteria that the government employed the second time. In your view, there's not much daylight between those two things? That's right. It's hard to tell what the difference is, because both in full field allowed a development of between 100% of the proponents' project and 97% in the EIS. There doesn't seem to be very much daylight between all possible and full field development. In your view, the agency misconstruing the scope of its authority meant that it did not consider reasonable alternatives, such as—I'm making this up—you could have had a 60% extraction instead of the 94% that they ultimately approved, or something else short of no action all the way to the top end? That's exactly right. In fact, we proposed, the plaintiffs proposed such an alternative, which would have kept all infrastructure out of the Teshekpuk Lake Special Area, a sensitive area, and would have still allowed 70% of oil production to go forward. That, along with other proposals, was denied or wasn't considered by the agency on the basis that it wouldn't allow full field development. I think the government's argument or counter would be, but they did ultimately choose something that was less than full development in their ROD. Why doesn't that save the agency's action here? It doesn't save the agency's action because the ROD demonstrates that the choices that were available at that stage were constricted by what had been looked at in the EIS. We know that because the agency could only go so far, stray so far from the EIS before risking a NEPA violation, and this was front and center in the ROD. At 1167, excerpt of record, the ROD quotes verbatim this court's test adopted in Russell County Sportsman that describes how much an agency can deviate from an EIS without requiring a supplemental EIS. It has that language of minor variation qualitatively within the spectrum of alternatives. The problem was that even though it adopted something smaller, it could only go so far. It was a minor variation. It was constricted by the EIS, which was constricted by this arbitrary limit that it put on itself that it had to allow full field development. That's not consistent with the authority that the agency has and its obligation to protect special areas to the maximum extent and protect services. Council, I want to jump in there to make sure I fully understand your client's position. Is the beef that you have with the full field development standard that the BLM concluded that it had no choice but to take that approach? Or would you also conclude that that standard, even if the BLM just chose it as its preferred standard and didn't think it was mandatory, that in and of itself is arbitrary? Your Honor, the record demonstrates that BLM thought itself that it didn't have the authority to approve. At Excerpt of Record 876-77, in the draft supplemental EIS, BLM screened one of its screening criteria. BLM said BLM must allow access to at least some subsurface resources. BLM may not permit development proposal that would strand an economically viable quantity of oil. So BLM thought itself constrained, and that was error and incorrect. So that's the focus of your argument, and not separately that regardless of whether it was constrained or not, this approach just is not consistent with statutory obligations? The approach isn't consistent with the—I mean, it would be different if—so they have a purpose and need, which they identified as getting oil out, allowing infrastructure to get the oil out, and consistent with the requirement to protect surface resources and provide maximum protection for special areas. That purpose and need is certainly capacious enough to allow less than full field development. Sometimes the BLM in its comments pointed to the purpose and need as a reason for rejecting alternatives, but it's not a reasonable reason because it's—we don't have a problem with the purpose and need. It encompasses a spectrum of alternatives. So my reading of the statute and some of the case law seems to suggest that the point at which the government decides some of these scope issues is when leases get issued. And I think there's some language, if I'm remembering right, it's the Connor case. I may have that wrong, but I think it starts with a C. But there's a point of commitment at the time that the lease is issued. And I believe the government relies on that fact to say that by the time we're to the project phase, which is where this case is, there's already been a commitment by the government to allow activities on areas identified within a lease. And so how much limits they can impose is restricted. Why is that wrong? A few reasons. As to the Connor case, that case was about whether the government had to prepare an environmental impact statement before issuing surface occupancy leases, non-NSO leases. And the issue there was at the point you issue a lease, you lose complete discretion. And so you have to do an EIS. That case doesn't address the scope of BLM's retained rights to limit activities on leases once granted. The leases here are specifically taken subject to the regulatory authority and the statutory authority of BLM. And BLM has an obligation under the statute to protect surface resources and to allow, to afford maximum protection to special areas. So under the Reserves Act, BLM can allow development to go forward only to the extent it meets those criteria. The existence of a lease doesn't change that analysis and in fact contemplates that plans for development can be rejected. The regs say that and it also contemplates that the government can regulate the rate of production. And the leases themselves have these mitigation stipulations. That was part of what the district court had originally keyed in on was the fact that you have the Reserve Act requirements, but you also have lease stipulations that recognize the government's authority to require mitigation efforts to surface areas. Which I would assume then you're saying if it's constraining itself to full field development, which is the equivalent of full oil extraction, then the agency isn't looking at all the different avenues it could for mitigation purposes. That's exactly right. And I would refer your honors to Excerptive Record 468 for the lease terms that's in section four and six are particularly relevant. And I'd refer you to the regulation 43 CFR 3137.73 B, which says that BLM may reject exploration plan and explain the reasons if and it so it has the authority to regulate these activities on the leases and in fact an obligation under the act and its regs to do so. Could I ask you about the Endangered Species Act claim? Part of your claim is that the agency did not get a full formal consultation with forest services and other agencies on the downstream effects of greenhouse gases. And one of the issues that has been raised is about the question of standing. So why do plaintiffs have standing to assert that claim? Plaintiffs here are harmed by the Willow Project. They have harmed their interests in polar bears and also harmed to their other interests. The harm is caused by the approval of Willow, and it's redressable by vacater of the rod. So that's that's all that's needed is that we have a standing to pursue a claim that could achieve a remedy that would that would alleviate our harm. And that's from Desert Citizens Against Pollution is an example of that. This court recognizing that case. So I think our standing is well recognized in that theory. What about Bellin, which talked about causation and this more attenuated question of, you know, you may be harmed by climate change or those or those effects, but it's but the agency's actions won't themselves affect the effects of climate change. Well, the source of standing in Bellin was harmed from climate change emissions themselves. Here we have harm from the project's other on the ground actions and don't need to rely on that just from climate change. And but if we did, we fill in the gaps in Bellin, which is there is here evidence of attribution science that that the greenhouse gases from this project will affect the reserve and affect our plaintiff's interest. And that's recognized by the agency itself in the rod at eleven sixty nine of the excerpts of record. BLM itself makes the connection between the greenhouse gases from this project and the need to mitigate surface resources. I'm taking you into your reserve time. Thank you for the questions. Thank you very much. Good morning, your honors, and may it please the court. Amy Collier on behalf of the federal defendants with me at council table is Jason Morgan, who's representing intervener Conoco Phillips. And I plan to speak for 10 minutes and preserve the remaining five minutes for Mr. Morgan. So the extensive record before the court shows that the federal defendants fully complied with their statutory obligations under NEPA, the Naval Petroleum Reserves Production Act and the ESA. At this court should affirm because plaintiff's arguments sort of misconstrued with relevant statutes and ignore the broader context that BLM is operating under. And I'd like to start specifically with the alternatives analysis, because I think that's where most of the court's attention is focused. And there are a number of points I want to highlight. One is just the broader statutory and regulatory context at play here. And two is more focused on what the decision that BLM is actually making here. So to step back, the statute itself, the Naval Petroleum Reserves Production Act, directs BLM to undertake an expeditious program of oil and gas leasing in the National Petroleum Reserve in Alaska. While at the same time imposing certain mitigation measures to mitigate impacts to significant surface resources with a focus of maximum protection in special areas. So as the district court found, BLM carefully balanced those two directives in sort of analyzing and identifying alternatives for this specific project. Taking a step back in terms of BLM's broader planning context, BLM has already prepared an integrated activity plan which governs oil and gas leasing and other measures programmatically across the 23 million acre petroleum reserve. And that decision most recently approved in 2022, which a number of the plaintiffs in both of these cases supported, closes 48% of that petroleum reserve to oil and gas leasing, including a majority of the land within the Tishikapook Lake Special Area. So that's the sort of the broader context. That plan also provides certain stipulations and operating procedures to mitigate impacts even further of that development. So, Ms. Collier, let me get to the heart of what concerns me is the notion of what full field development means and whether that guiding principle that the agencies used constrained the scope of its reasonable alternatives analysis. How do you distinguish that concept? I want to ask where it came from, but also how do you distinguish that concept from the prior one about leaving no, you know, developing all possible oil and gas? Yeah, so I would like to direct the court's attention to the 2021 district court decision where the court stated essentially BLM essentially assumed that ConocoPhillips had the right to extract all possible oil and also did not give enough attention to the provision in the Petroleum Reserves Production Act that maximum protection be given to those special areas. So the difference in my understanding of full field development and all possible oil is quite clear. Full field development as defined at SCR 1193 in BLM's own words means not stranding a substantial amount of oil, a significant amount of oil that's standing alone would be economic to develop. Meaning BLM would expect that the leaseholder, in this case ConocoPhillips, would submit an additional plan to develop those leases under its existing lease obligations and rights. And so the regulations speak to the fact that ConocoPhillips has an obligation to develop its leases. In this case, the Beartooth unit is a unitized lease that BLM treats as a single lease. And in developing that, ConocoPhillips has to propose a plan to fully develop those leases. But the agency doesn't have to accept that plan. And so that's been the disconnect in my mind. I know you've pointed to the regulation that says for continuing development, you have to develop a plan and propose it for full development. But the agency has a separate obligation to mitigate and to look at reasonable alternatives and doesn't have to accept. In fact, it can't accept a full – fully developed economic plan. So why – I go back to where is – was it possible for the agency to consider an alternative that was 60 percent oil extraction instead of the 94, 95, 96 percent? So I want to be really clear here that BLM's decision in the ROD is not to authorize a specific amount of oil production. That is not BLM's decision. BLM's decision, as explained in the EIS and as explained in the ROD, is to approve infrastructure and the operation of infrastructure to extract the oil. And that's an important point because the estimates of oil production for each of the alternatives is just that. It's an estimate. It's a projection of how much will be recovered under different development configurations and scenarios. And of course, that could change with the changes in oil prices, with the changes in technology. And so here BLM reasonably – again, the standard is reasonability and whether it was arbitrary – reasonably looked at the statutory language, which speaks to mitigating impacts to surface resources, and developed a range of alternatives that range quite significantly in terms of infrastructure, disruption to surface resources, construction time, and evaluated those alternatives in terms of their impact. Now BLM also was quite clear – and I want to push back on this point from plaintiffs – BLM was quite clear that it did not have to authorize full field development. And that, again, is at SER 1193. BLM explained that it was evaluating full field development in order to get a full, you know, scope of the potential impacts of what development of these leases would look like and to have a proper comparison between the alternatives. But it explicitly stated in that comment where it was talking about full field development that it may condition actual project approval on various mitigation measures that might reduce the amount of oil that is actually extracted. Because I've actually seen different statements that – you know, in the draft EIS, but also in different consultation notes that full development does not mean that an applicant must recover 100 percent, but an applicant cannot strand an economically viable amount of recoverable resources. And that's in SER 2536. Is that – was that the guiding principle behind full field development, or did it change along the way? I think, you know, speaking to what the applicant can or can't do, again, goes to that regulation speaking to what an applicant must propose. I think that might have come from one of the consultation meetings in November 2021, perhaps. There were various meetings, again, with a number of the plaintiffs' groups in this case where BLM reiterated the same point that the EIS will evaluate full field development scenarios, but may not ultimately approve a full field development proposal in the ROD. Do you agree that the government indicates in its documents that it concluded it must do a full field development analysis? I don't know necessarily if it must. I think it was eminently reasonable and certainly not arbitrary. That's a different question. What I'm asking is, in this case, did the BLM conclude that it must do this? I'm not sure if it concluded that it must, and I hesitate to sort of define the scopes of BLM's authority in that sense. I think BLM, you know, understood that the project, that the lessee's obligation was to propose full field development, and BLM understood that if it sort of piecemealed or segmented the analysis of partial development and put that alternative side by side with other alternatives, it wouldn't give a clear picture of what the full impacts would be. And I would also point out that the plaintiffs at various times have cautioned BLM against piecemealing that analysis and essentially telling BLM that it should evaluate the full potential development of this unit and of these leases. I mean, I get those rationales behind the BLM's choice to use the full field standard. It seems to me that our analysis in terms of figuring out whether there was a violation here, there's a material difference if the BLM is saying we must do it this way because our legal obligation is to do it this way versus we read our legal obligations to allow going with this approach, and here's all the reasons why we think this is the right approach. And I think that the plaintiffs are suggesting that it's the former that BLM said we're obligated to take this approach, and that in doing so, it misapprehended its scope of authority. So that's why I'm asking this question. I think it's really, I think it matters a lot in terms of how we analyze this case. So I'm going to ask it again in terms of did the BLM think that this is the scope of its authority or just a reasonable option within its authority? So it's hard to answer in the abstract. In the record before us, I think BLM repeatedly states the reasons why it is reasonable to analyze in this way and why it should analyze in this way. I also just want to emphasize again that BLM did not ignore alternatives that would have been non-full field development. It fully analyzed in Appendix D to the EIS. It mapped out the specific alternative that plaintiffs suggested. It overlaid these various maps with the subsurface resources and with, again, the provisions in the IAP and in the sort of broader sort of planning process of where infrastructure could be laid out and where it could not be. And it mapped that out. It explained, you know, in this particular context, 67% of ConocoPhillips lease rights by surface area are within the Tishak Lake Special Area and eliminating infrastructure from that area would not only eliminate access to leases that, again, ConocoPhillips has a right and obligation to develop, but would also create an overlap in drilling reach and, you know, the same amount of potential surface infrastructure with less oil development, which just does not fit with the mandates in the Petroleum Reserves Production Act. But then it sounds like your last answer is suggesting that the agency was required to pursue full field development because it sounds like, I mean, at face value, what the government documents are saying is that you could not strand significant quantities of oil and gas. I want to push back really clearly that the BLM did not believe it was required to authorize full field development. And in fact, it did not authorize full field development. And it repeatedly stated it was not required to do that. What it said was that for this NEPA analysis and comparing potential development scenarios, it made sense. And it would, again, you know, the point of an EIS is to give the decision maker the relevant information to make the decision. It made sense to compare these alternatives and their full scope of development. I would also just point out, again, that alternative EIS studied in the EIS called for four drill sites. But one of those drill sites would have been deferred. The approval wouldn't have been approved in the ROD itself. So again, while it was analyzing, you know, full field potential impacts from the infrastructure, it was not itself necessarily approving all four drill sites there. Can I suggest that you that the government made an arbitrary decision because it adopted a standard that says you cannot strand economically viable amounts of oil and then the alternative it chose did just that. Why is that wrong? Well, I would like to just note that the plaintiffs do not argue that BLM was not within its rights essentially to adopt the alternative in the ROD. They've never argued that that alternative was not within the scope of the alternatives considered in detail. I would also point out that there is a place, and I don't know if I have it right in front of me, but there is a place where BLM in the EIS discusses the fact that alternative E, you know, sort of sets forth and estimates what the impacts or what the potential oil development under alternative E without drill site five would have been. So again, I think it's within the scope of what BLM analyzed, and I think it's quite consistent again with the BLM statement that it might condition project approval on the imposition of certain mitigation measures. Again, consistent with its statutory authority under the Petroleum Reserves Production Act. I guess what I'm wondering is why did the government go down the road of fulfilled development if it didn't think it was bound by that? If, you know, because the draft EIS has certain language and the finally SEIS has certain language. And at the end of the day, I'm a little confused by the notion of the segmentation analysis, if you could walk me through that. Because as I understand it, if the agency decides not to allow fulfilled development and leaving areas stranded, the government's position is a new permit applicant could come in and ask for that application. And so therefore the government would have to analyze that, but it wouldn't have to accept that permit. And why is that segment in the analysis? Wouldn't the analysis have already been undertaken beforehand to see what mitigation arrangements should be made? So if BLM, so in this case ConocoPhillips has relinquished its rights to the leases that were not approved for development under the ROD. But if BLM had approved a project for less than fulfilled development and the leaseholder still maintained rights to those leases, they would have an obligation again to submit a plan to develop those leases. And so BLM's approach, as it explained again on 1193, 1194, 1197, was that it did not want to have a scenario where it didn't have a full sort of picture of the scope of what those impacts to surface resources would look like. But that's the part, I'm sorry to interrupt, but that's the part that why wouldn't it have a full picture analysis? Because if the agency already undertook an analysis and said, we're not going to allow you to extract the entire field, it has taken a big picture view of everything at that point. And so if there's a new permit application, the agency could either say, well, consistent with what we decided before for mitigation reasons, for other reasons, we're not going to allow it. Or we analyze it in a different way and allow more extraction. But I'm not getting a sense of why there's a not complete picture in this process. So I think there's a little bit of a difference between the record of decision and again the analysis in the supplemental environmental impact statement. There, BLM is analyzing side by side the various alternatives and the impacts that they would have. Again, focusing as it is statutorily required to do on the infrastructure and the surface disruption to infrastructure. Again, it estimates the amount of oil, but the focus is about infrastructure itself. The ROD is the decision, again, approving a modified version that has less surface infrastructure and disapproves a pad. But the focus in the EIS was again to compare different development scenarios for this unit, for this unit of leases that ConocoPhillips already possesses. For areas that are open to gas leasing and for, again, under the case law in Connor and Kempthorne that ConocoPhillips has a right to an obligation to develop and sort of constrains BLM's analysis there. So if you look at the EIS as sort of a decision tool for the decision makers to evaluate the impacts of the various alternatives and then at the record of decisions stage to, again, apply its discretion and its statutory obligation to impose mitigation measures. So I've taken this over a little bit and I had some more questions about the Endangered Species Act. Are you better, more appropriate to address those questions or your colleague? We did not take an argument on standing. I'm happy to discuss any sort of merits arguments related to that, to the ESA claims, but we did not take a position on standing. On the merits side of it, the service, as I understand it, BLM sent a letter to Fish and Wildlife Services and said you don't need to look at the downstream impacts from climate change, from greenhouse gases as part of your analysis. And therefore they never took, the service never undertook a formal analysis of the impact that this project would have on contributing to climate change and what effect that might have on diminishing ice flows and polar bears and seals. Why, I guess my question is, if a project of this size wouldn't trigger a formal analysis from the service, what would? So I want to push back on a couple of points there. Again, the ESA regulations specify that BLM as the action agency is supposed to determine whether its proposed action here approving the Willow Project may affect listed species. BLM made that affirmative analysis decision for the polar bears and ice seals. And for polar bears specifically, it determined that it may affect and may adversely affect polar bears. And so it engaged in formal consultation with Fish and Wildlife. At that stage, the standard is different. It's not the may affect standard anymore. It is the effects of the action standard, which is defined at 50 CFR 402.02 to be effects of the action on listed species. So it's the consequences to listed species or critical habitat that are caused by the action, meaning they would not occur but for the action and are reasonably certain to occur. Now BLM's memorandum to Fish and Wildlife came in the midst of ongoing formal consultation. And it was in response to specific comments that plaintiffs raised during the NEPA process. So BLM saw these ESA related comments, saw the studies cited, and looked at the scope of the ongoing consultation to determine whether there were any additional effects of the action, again as defined by that regulation, that it should be consulting on. It determined that based on the various studies and the comment itself, but then also other scientific studies, that while there is some quantification that can be made between certain amounts of greenhouse gas emissions and certain amounts of sea ice loss, those don't necessarily give the experts the information to identify specific consequences to listed species or critical habitat here that are caused by those project-specific greenhouse gases. And they discussed the fact that, you know, it's unclear where in the millions of circumpolar square miles of Arctic that sea ice loss might occur, what type of sea ice loss might occur, whether and how that sea ice is used by the species at issue here. But doesn't the agency also have a requirement to look at cumulative effects? So, and the agencies did, and throughout Fish and Wildlife's biological opinion, it does discuss and address climate change and impacts of climate change to the species where it's appropriate and relevant for other parts of the consultation. So, in cumulative effects, in the baselines of the species and the statuses of the species, the agencies did not ignore the fact that climate change is having effects or impacts to these species. But the question for under the ESA regulations and ESA itself is whether this project has project-specific causation effects of the action on listed species and critical habitat. And in your view, the project-specific effects have to be tied between the emissions caused from the project to potential ice loss from those emissions, as opposed to a broader context of this project will contribute X amount to overall climate change. And that will in turn is expected to create this amount of ice loss in this region. I think that's the experts at Fish and Wildlife and NIMS. I think that's their determination that there needs to be that causal connection, again, to specific consequences to these listed species. Again, it's a but-for causation standard that they're applying here under the ESA regulations. And I would just emphasize again that the plaintiffs have not argued that the agencies ignored any specific studies or that they, you know, ignored the studies cited here. They don't identify any additional studies that can draw those causal links. And the Endangered Species Act requires the agencies to apply the best available science, which both this court and the Supreme Court has said that they're not supposed to rely on speculation or surmise. And so addressing plaintiffs' exact point here, again, unlike the case, the CBD case cited in the briefing, the experts applied their expertise and determined that this could not be identified as a consequences to listed species or critical habitat. And I would just emphasize again that that's consistent with all of the agency's past practices. It's consistent with other agencies' approach to these emissions as well. Okay. Let's turn to your colleague and hear from Mr. Morgan. Good morning. May it please the court, Jason Morgan on behalf of ConocoPhillips. I want to jump right in on fully develop. That seems to be a concern here. And in our view, the best way to read the EIS is the use of the fully developed language as basically a pragmatic and transparent and reasonable way for BLM to organize its analysis. And I want to, I think some context is useful here. If you look at 5 S.E.R. 1279, that's a map of the alternative that plaintiffs are proposing. It's the no-TLSA alternative. And the first thing that jumps out at you right there is that there's a giant section of the unit that would not be developed. And so when BLM said, so to step back, that's part of a unit. A unit is something that comes from the statute, which authorizes a leaseholder to group together their leases and for BLM to make a determination that it's in the public interest to develop those leases as a unit to reduce infrastructure and to reduce surface impacts. And BLM approved a unit agreement for that unit as in the public interest several years ago, and that decision was never challenged. So now with a unit, the company is required to come forward and say, here's our proposal to fully develop the unit. And why do they have to give a proposal to fully develop the unit? So that they don't come back in a year later and say, well, we said we're only going to do two pads here, but actually we're going to do four more over here. And if you look at Plano's proposal at 5 SCR 1279, what you see is a very obvious area where the company would come back and say, yeah, we want to put more pads there because there's more oil. In fact, there's maybe 200 million barrels of oil there. It's a lot of oil. So BLM made the determination that its analysis for purposes of full disclosure should consider full development alternatives. In other words, this is all that you're going to do for your development of the project. But Plano's argument is that's all they did, right? That the agency was guided by full field development, which is you cannot leave any economically viable oil unextracted or significant amounts. And therefore, it did not exercise its discretion to consider other alternatives that were not full field development. And how would you how would you answer that? They did consider their alternative. It's in the alternatives appendix. They mapped it out. They showed where the drilling locations were. They showed where the drilling reach would be. And they concluded that it's not consistent with the statement of purpose and need to carry that particular alternative forward. Why? Well, again, context is very important. The Willow project is not being presented on a blank slate. You have integrated activity plans that say this portion of the Chesapeake Lake Special Area should be open to surface development. This portion. You have leases issued by the BLM over a period of 20 years that say you have a right to develop these areas. You have a right to surface development subject to reasonable restrictions. And you have a unit agreement that says we agree it's in the public interest to develop this as a unit. So how could BLM then come back and say I know we've zoned it as open to surface development. I know we've issued you leases and charged you millions of dollars for these leases. But we're not going to allow you to develop this area even though your proposal complies with all of the stipulations in the integrated activity plan and all the stipulations in the lease and many more stipulations put forward ultimately in the record of decision. What would be the basis for that? It would be inconsistent with the statutory obligations which is why BLM screened it. So your view is that the agency could not adopt an alternative that foreclosed infrastructure in the special area given the history that you just described? Not because of NEPA, not because of the analysis they did on NEPA, but because it would be inconsistent with the statutory framework, the statutory lease rights with the framework. But the lease rights encompass mitigation stipulations. The statutory framework contemplates mitigation and maximum protection. So where in either of those things supports your argument that they could not consider any development in the special area? They could not. That they could not consider as an alternative no infrastructure in the special area? The area is open to surface development. It would be like you go to do a subdivision in an area that's zoned for subdivisions or zoned for a certain housing density. And you comply with the setbacks. You comply with the buffers. You comply with everything that's required by the code. Can the county come and say, you know, we just decided we didn't want to do this after all? I mean, that's arbitrary and capricious. And that's what we have here. You're in the context where there's an integrated activity plan, which plaintiffs here supported as a reasonable approach. But now the developments come. They're not so sure they like their agreement. But they support it. The plan approves it, allows this kind of development. All the proposals comply with that, with those restrictions. What would be the basis for them to say, you know what, we've decided arbitrarily we're not going to allow you to do that? Well, I mean, I guess one could say not arbitrarily, but under the requirements of the Reserve Act, ANILCA, any number of things. We have to consider other mitigation efforts that are even more protective of surface areas than what Canocha Phillips previously wanted. So we'll consider something that's not, you know, in the 94% range. It might be in the 80s or 70% range. I guess I have two responses to that. The first is I would agree with the government's assessment that it's not about the amount of oil that's being produced here. It's about the surface impacts. And the second response is keep in mind that the question here is was there a reasonable range of alternatives evaluated? And the touchstone of that inquiry was whether there was informed decision-making. BLM did not have to consider a no-BT5 alternative in order to decide it wasn't going to approve BT5. BLM did not have to consider a no-TLSA alternative in order to say I'm going to take that alternative. In fact, it was mapped in the EIS. What precluded BLM from doing that was it was inconsistent with the statutory obligations, not because of the inadequacy of the analysis that was presented. Okay, I think I understand your point. I have exceeded my time, but if you have questions about other questions, I'm here to answer it. I do not. Let me see if Judge Forrest has any questions. I don't. Okay. Thank you. Your Honor, I'd just like to address three things on rebuttal, please. One is that I'd like to walk you through exactly in the EIS where all the places in which the government says that it thinks it has to approve a full field development. So the first is at 876, and that's in the draft EIS, sets as a screening criteria that BLM must allow access to at least some of the subsurface, and BLM may not permit a development proposal that would strand an economically viable quantity of oil. And in rejecting plaintiff's alternatives proposals in the final EIS at 1048 and 49 of the excerpts of record and 1055 and 56, the reason for rejecting the alternative was that it, quote, would strand an economically viable amount of oil. That's the reason it was rejected. And similarly, throughout the administrative process at 666, 669, 682, 684, and 674, all of those places show specific rejections of alternatives because they would not allow full field development based on the government's thoughts that it was restricted from approving things. And even alternative E, the new alternative that was created, in the EIS at 917, it says alternative E evaluates the full development of the Willow Reservoir. So the EIA is crystal clear, was bound by mistaken belief that BLM had that it was restricted from approving anything but a full field development. Of course, that's inconsistent with its authority. And it also was rejected by the agency in the final EIS, in the final ROD, showing that it's arbitrary. Why isn't it a fair reading of the BLM's decision that it gave a second reason, even if it did conclude that it was required to take this approach, that it gave a second and alternative reason that it was doing this to avoid the piecemeal analysis segmentation question? Why isn't that an alternative reason that stands? The piecemealing is respectfully a red herring. The fact that the agency has to evaluate a full field doesn't mean that it can't evaluate other alternatives that were less than full field that it had the authority to approve. The EIS would tell the full scope by having assessed the full field alternative, but EIS and its alternatives are supposed to inform the decision being made. And here the decision being made was whether to allow full field, less than full field, something else. That's the authority that the agency has, and the NEPA analysis is designed to inform that. Am I correct that the plaintiff's argument really is just a process argument? You should have been looking at more alternatives, but you're not necessarily saying that even if they had looked at more alternatives, the decision they reached was arbitrary? The decision that they reached was constrained by the lack of alternatives they looked at. They were required to look at reasonable alternatives. I understand that, but I guess I'm asking you a hypothetical. Let's say that they looked at a couple of these other alternatives that you think they should have, but yet they came to the same substantive decision. Would we still be here? Well, we might. They have to justify their decision under the NPRPA that it meets the protective mandates of the NPRPA. So they have to look at alternatives that inform their decision, and then they have substantive requirements under the NPRPA to protect surface resources and provide maximum protection of special areas. With respect to the ESA— Well, before you move on, I suppose there's a couple ways to address that. One is if the agency said, we're rejecting this alternative because we have to do the full field development. And then another way is we're rejecting this alternative because in our discretion, the proper balance between these different competing interests, we're going to go with more extraction and whatever it is. And those are two different things, right? One of them is constraining one's discretion and the other one is exercising it. Is that— I think that's right. And the NEPA violation is that they considered—they rejected reasonable alternatives on this basis that they had to apply full field. Had they considered reasonable alternatives like those suggested by plaintiffs, we don't know. They might have been—they might have chosen those. They're supposed to look before they leave. The point of NEPA is that you make the agency look at its alternatives and that informs the decision that they make. And how would you respond to Mr. Morgan's argument that the agency could not have taking up an alternative that involved no development within the special area? We disagree. If the agency determined that—I mean, it's a fact-intensive inquiry. If the agency determined that maximum protection of the Teshekpuk Lake special area required no infrastructure there, it could make that choice. With respect to the ESA, nobody disputes that this court's case, Center for Biological Diversity, governs. That case holds that when an agency is engaged in formal consultation, every part of a project that may affect species must be considered in the biological opinion. Now, the Fish and Wildlife Service did that for everything, all impacts of the project, except greenhouse gas emissions. And that violates the ESA. The government argues, well, the Fish and Wildlife Service did comply with CBD because it sent an email. Even if that email is not in the biop, so it's not treating—it doesn't meet the letter of CBD, it also doesn't evidence any of the Fish and Wildlife Service applying its expertise to the science and determining whether—what the effects and what the scope of the effects are, as it did for every single other impact, like vehicle traffic and airplane traffic, all the other impacts, even when it concluded in the biop that those might be insignificant or immeasurable. It still applied its expertise, considered mitigation, and showed its work and explained its assessment of the best available science. But Ms. Collier's point, I think, is that the agency looks and sees that there are no scientific studies that permit it to link up the project itself to climate change impacts nearby. And so, therefore, the best available science doesn't allow a more fulsome analysis than what they did. The Fish and Wildlife Service—there's no evidence in the record that the Fish and Wildlife Service did that. It's the expert agency, and it's required to do that analysis. It disagreed in its email with the BLM's conclusion that Willow would have no effects because they couldn't be determined. It said at 1273, policy prevents the service from concurring with the determination of no effect. So it disagreed that there was no effect, yet it did not assess the impact in the biological opinion, and that violates CBD and the ESA, because it's certainly plausible that the emissions from Willow could have an effect. We have evidence in the record—there's scientific studies in the record—the NOTS study at 844 and the MOLNAR study at 799. The NOTS study links individual emissions to sea ice loss, and the MOLNAR study links sea ice loss to population-level impacts to different subspecies of polar bears. That's at 799 in the excerpt of record, and there's no evidence that the Fish and Wildlife Service grappled with that at all, and that's what's required by CBD and by the ESA. Okay. No further—oh. No other questions on my end, Judge Forrest? Okay. Thank you very much. Counsel, thank you all for your helpful arguments. The matter for this case will stand submitted, and we'll call our final case.
judges: NELSON, FORREST, SANCHEZ